The next case on the call of the docket is Agenda No. 13, Case No. 130431, People v. Smollett. Counsel, are you prepared to proceed? Good morning. Please proceed. Good morning, Justices. May it please the Court. My name is Nene Uche, N-E-M-Y-E, last name U-C-H-E, appearing on behalf of the appellant defendant, Justice Smollett. Prosecutorial agreements that induce a defendant's specific performance should be enforced, irrespective of how unpopular a defendant is in the public eye. In essence, we hearken back to the age-long principle that a deal is a deal. In the present case, Your Honor, there was a deal. The prosecutor made that clear. Counsel, let me interrupt you. I noticed that your opponent made the argument that there was no evidence in the record to support the agreement that you talk about. Yes, Justice. Obviously, we disagree with that point that you're making, and the reason we disagree is threefold. Number one, the prosecutor says it on the record. The proof is in the pudding. She says it clearly that Mr. Smollett has agreed. Now, when you talk about the record, which record are you talking about? There are two indictments, two cases. Correct. Which record are we talking about? So, Justice, I'm specifically talking about the first record that was made in the first indictment when Mr. Smollett was indicted, and specifically referring to the day his case was dismissed. That's March 26th? Correct, Justice. And on that particular day, she made the comment that she, on the record, stated on the record to the judge, the trial judge, that Mr. Smollett had agreed to give up his bond, perform community service, and, Justice, I think the... Now, that's one case, but that's not the case that's before the court, correct? Correct, Justice. I think that's one case, but it's related, because the entire basis of this appeal is saying that the initial case was already disposed of via an agreement, and so I think the... What were the charges in the initial case? The initial case, it was disorderly conduct. How many counts? I believe there were nine counts. I apologize. I thought there were 16. But 16 counts of disorderly conduct. Correct, Justice. Okay, in the second case, how many counts? Judge, I know there were not the same amount... I think there were six counts, but the same charge, disorderly conduct, correct? Okay, proceed. Thank you. So, Justice, what I'm saying is, she says it on the record, and I think the key term here is, after nulling the case, she makes a claim, we believe this outcome, and I quote, is a justice position and appropriate resolution to this case. But even if we were to ignore that statement she makes on the record, I think it's also important to look at the investigation that the OSP conducted. And the people they interviewed, the prosecutors they interviewed, were under the pain of prosecution if they lied. And Justice Lyle mentioned that in her dissent in the First District Appellate Court, where she noted that the OSP's investigation found two critical things. Number one, that the statement the prosecutor made during the dismissal of the first indictment was drafted in collaboration with the defense. And number two, the investigation by the OSP found that the prosecutor had intended that the agreement track the deferred prosecution agreements that we have in the state of Illinois. So I think to answer your question, those are the three, I think, critical facts showing that there was an underlying agreement. And I don't believe OSP is going to get up here and argue that there was no agreement. They are in agreement that there was an agreement. We just disagree on what the terms of the agreement were. OSP believes, according to their briefing and their argument in the First District, that the agreement was for a non-epross, almost a temporary prosecution. It's our position that it wasn't, that it was for a non-prosecution agreement. And so I think that's what really distinguishes this case from most cases. And to add to that. Counsel, can I ask you a question? On the non-epross, at the time it was put on the record, had your client actually already performed the community service? Yes, Justice. The record is unclear in terms of the day the prosecutor was speaking. I will note something you're alluding to. She did mention that Mr. Smollett had performed community service. And then when she was getting into the bail bond is when she mentioned and has agreed to pay his bail, to give up his bond. I'm unsure if he had already performed it because it's not clear on the, within the four corners of the record that we have in front of us right now. Counsel, it seems like you've got a lot of factual questions. Yes, Justice. What is the ultimate relief you're asking for? Justice, I'm asking for reversal. I think what distinguishes this case from a lot of other cases is we have the investigative body of work by the OSP that's part of the record where they state what Cook County prosecutors intended to do. So this is not like the Starks case from 1985 where there was some disagreement as the second district noted, or the Supreme Court, I apologize, noted that, you know, there was a disagreement as to the terms. We have two parties that formed the agreement that collaborated to draft the initial statement agreeing that this is the agreement. It was to track and defer prosecution. The only body or agency that doesn't seem to agree with this is the agency that wasn't in the room when this agreement was drafted, which is the OSP. So I think that's the critical distinction here. So as an alternative to my argument, I would be saying if any of the justices here believe that there might be a disagreement in terms of there might be a factual dispute so their reasonable minds can disagree, Justice, I'll be asking for an evidentiary hearing in trial court. I think, as Justice Lau pointed out, the job of the prosecutor is to be an avatar of the truth, right? The prosecutor has no clients. Their client is Justice. And I believe if anyone should be eager to get to the bottom of what the terms of this agreement are, it should be the OSP. They should want to know, especially because they conducted their own investigation. But, Justice, I think the case law is clear here. We have the Starks 85 case, the first case, the Supreme Court case, that reversed the Second District for the exact same thing the First District did in this particular case. In Starks 85, this Supreme Court mentioned that the Second District had committed error because the Second District found that they couldn't decide the terms of the agreement. And hence, they were going to uphold the conviction of Mr. Starks. And that was reversed by the Illinois Supreme Court. And I think three things are very important as to why that court reversed. And I think they stand out to show that Illinois has always, even before the U.S. Supreme Court's decision in Santa Bella that said agreements must be enforced, Illinois has always been ahead of the game, if I might say, since 1925. But even before we go to 1925, the Johnson case, which I cite in my brief, I think it's important to know in Starks, the reason was the court was looking at the whole picture. Irrespective of whether Starks was accused of a violent crime like armed robbery. Their main focus was on maintaining the integrity of the plea bargaining system. And three things stand out in the Starks case. First of all, unlike this case, Starks brought up his agreement issue in post-trial hearings. And even with that, the court was keen on addressing the issue of the Supreme Court. Number two, the consideration used in forming the agreement in Starks, the Supreme Court noted, was the Fifth Amendment clause, which was not even impactful to the actual trial, if there was a trial to be held. Because it was inadmissible, the lie detector test was not going to be admissible in trial. But in spite of that, the court still enforced that agreement. And I think that the gist, main gist of the Starks case, or the foundation of the Starks case, excuse me, was laid within the foundation of out-of-state cases that enforced prosecutorial agreements within the context of a motion stating non-enforced. This Supreme Court, albeit a different panel, was obviously aware of the cases they were citing to in Starks 85. They knew very well that those cases had to do with motion stating non-enforced. But that did not stop the court. And justice, I think, when we look at Starks 86, that was the case when the Starks case was sent back, reversed for a, remanded for an evidentiary hearing. They had the evidentiary hearing, Mr. Starks won that case, went back up to the Second District. And the Second District noted that the distinction, the critical piece that the courts had to look at, is whether the defendant has completed his own part of the bargain. And in this case, Mr. Smollett has given up his $10,000 bail bond. That's a lot of money. And justices, even if there's any justice on this panel that feels, you know what, I don't believe there was a contract. I don't believe there's a dispute that reasonable minds can disagree. Even looking at the essence of what the prosecutors or the OSP's argument, they're saying prosecutors have the unfettered ability to bring back charges, essentially. And that's never been the law in Illinois. Because in Illinois, you have to show or reach the threshold of one, that there are no constitutional defenses. Of two, that there is no bad faith or harassment. And three, showing that there is no fundamental offense. So if we were to push aside the contractual issue and just strictly look at this, can prosecutors walk into a courtroom, collect someone's, you know, convert a defendant's $10,000 bail bond. Turn around, re-prosecute the case, and say, we used the wrong word in court, or we used a word that brings up some disputes. So we, on a technicality, get to keep your bail bond. We don't return it to you, but we're going to prosecute you again. And justices, I don't think, under any objective analysis, anyone can actually say that that is fundamentally unfair. So that gate is already closed to the prosecutor, if we're to ignore the… A nollie prosecution does give the prosecution a right to re-indict or re-bring its action, correct? Correct. Only within the context of the unilateral nollie. So if a prosecutor walks into court and says, motion state SOI, I apologize, motion state nollie prose. For whatever reason, maybe they're thinking of adding more charges, upgrading the charges. Absolutely they can. The defendant had nothing to do with that. So what happened in this case? In this case, we're arguing it was a bilateral nollie. And Justice Lau references that in her citation as a persuasive authority to the Connecticut Supreme Court in Colbert. In that case, something similar happened. And by the way, I will mention, just to harken back to your question, in that Colbert case, it was sent back for an evidentiary hearing. In this case? Yes, Justice. Who was in court on the day the nollie prose was entered? Justice, it was a trial judge, and I think that's important. The prosecutor, the Cook County State's Attorney, the defense team, albeit other set of defense attorneys, and Justice, I believe the media was present, right? And so everybody saw it, everybody heard it, and I think that showed a bilateral nollie prose. I think there should be a distinction made as Justice Lau states. What's the significance of the fact that the judge granted the motion made by the state to nollie the prose of the case? Does that have any effect? Justice, I think it has a profound effect. And in terms of it draws a distinction with the other cases, it makes it more severe. And what do I mean by that? In most of the cases that we've reviewed in terms of contractual agreements, prosecutors have made a deal. The defendant has done something. Defendant comes to court, like the Starks case, and says, where's my dismissal? And the prosecutor says, we changed our mind. We've reneged. In this particular case, the deal was not just an offer made, there was an acceptance, there was consideration, and it was executed. So in other words, this case really stands out because we're dealing with a resurrected agreement that was already signed off by a trial judge. And quite frankly, I think it also taps into or erodes into the role of the trial judge. If the trial judge had questions about the deal or there was something weird going on, I think the trial judge had every authority to raise those points or not accept the motion. But in this particular case, all seemed fine. And I think this, again, drives back to the main point, which is this case is extraordinarily unusual because the prosecutors and the defense have an agreement and agree that there was a non-prosecution agreement. And we notice, if you're not able to take into consideration the statement made on the day of the dismissal, take into consideration the OSP's own investigation, for which the defense did not participate in that investigation. But their own investigation found that the prosecutors, the Cook County prosecutors, intended for this deal to track deferred prosecutions. And so, Justice, I think the main point of an agreement, contractual law, is to determine the intents of the parties. And the intents of the parties seem clear here. And this was a seasoned prosecutor that made the statement, we believe this to be a just and fair justice position of this case, after offering the words motion statement on the cross. But, of course, our position is it doesn't matter because this was a bilateral agreement. Has this court ever made a distinction between unilateral, not a cross, and bilateral? Justice, they've never used those terms. I think it was already implied, right? When you look at the Starks 86 case, there was no question, no question that this could be done, that an agreement, and I think the key word here is agreement, reached between a prosecutor and defense can be enforced regardless of the proceeding. And if your honor has any doubts to it, I would just draw your attention to page 14 of my brief, the people versus Johnson. A non-prosecution agreement was enforced within the context of a motion statement, a motion statement as well. Which I believe from my reading of the caseload, this court doesn't really recognize as being anything effective in terms of, I think this court has criticized the use of that phrase, motion statement as well, as being more administrative than steeped in law. Nonetheless, I think that's a clear sign of where this court has been going in the sense that the motion statement as well has no fairness protections. Everybody in Cook County, and I think in most courts around the state, know that when a prosecutor says motion statement with leave to reinstate, that they're bringing back charges, or they have the power to bring back charges. In Cook County, I believe it's about 120 days or 160 days to bring back charges. In that event, in people versus Johnson in 1925 or 1939 case, Illinois Supreme Court, the court still enforced a non-prosecution agreement. The court didn't care that it was done the mechanical way the case was thrown out was in motion statement as well. Their focus was what was the intent of the parties. Prosecutors cannot hide behind technicalities of the languages that they use as the government with the power to say, hey, I use this term got you. I'm bringing back the charges. I think that's I think that's key. And also, I'll point your honor to people versus Bogolsky in 1925 case, which I cite in the footnote of page 13 of my brief. And I think that case is also critical to the Illinois Supreme Court. They were talking about the enforceability of a non-prosecution agreement. And that Supreme Court in 1925 noted that one of the ways to perfect a non-prosecution agreement within the context of a cooperation agreement is through a nollie cross. These were options they were using. So I don't think there's ever been anyone who has questioned this state that I stand to be corrected. Whether a non-prosecution agreement can be enforced within the context of a motion state nollie cross. I think the focus has always been on the intent of the parties. And Justice, I'll just make one more important point on this issue, which is the policy implications. I think for some cases, I think attorneys, we come up and we argue policy and there's a tendency to be redundant. But I think policy really matters in this particular case. Here's why. As Justice Lau mentioned in her opinion, there are thousands, hundreds of thousands of cases in Illinois that have been dismissed via non-prosecution or what we call deferred prosecution agreements using nollie cross. Even in misdemeanor land, when you walk into a misdemeanor courtroom, prosecutors make deals all the time. Tell your person to perform community service, motion state as well. You know, putting aside any time bars for cases like that, what are cases that are not time bars where there's no statute of limitations that have been motion state nollie cross with a deferred prosecution? Do we resurrect those cases too? Do we go around from county to county roving, you know, upturning deals prosecutors made because a new prosecutor has been elected or a new prosecutor has been appointed? So I think there is a major issue with backlog. What if pro se defendants then make deals with prosecutors, right? So I think really, from a policy perspective, we have a problem here because if not, a lot of agreements that have already been formed, agreements that are probably being formed in Cook County or in Illinois today, face the risk of being reversed or reversed in the future. Or thrown out of court. And that could lead to a backlog in our justice system. Counsel, I have a question on a different issue.  Your contention that the city of Chicago, the police department cannot be considered a victim under the restitution statute. That's our position, Justice. And so any, how are any amounts that would have been expended maybe over and above regular efforts? Justice, I think for this particular case that we're talking about, to the point you raised, I think the key, there are two key points. Number one, we have a situation where some of the receipts were not tenable. What do I mean by that? You have one receipt that didn't have dates and hours stated. It seemed to the defense that the department was just submitting receipts. And I don't accuse them of anything, of course. But my position is when we start making police departments victims of jobs that they already paid to come down, I think we run into some of these issues. How do we pass out police officers over time from a job he's already doing? And I think there were some major issues regarding some of the receipts in this particular case. And I think that's really our main contention, Justice. I don't know if I've answered your question. Thank you.  And, Justices, I would like to turn it over to the next issue.  I'm done. Sorry. Sorry about that. Well, you can conclude your. I'll do it over the phone. Thank you. Thank you, Mr. McJay. Good morning, Counsel. Good morning. And may it please the Court, Counsel, I'm Sean Weber. I'm a Deputy Special Prosecutor, and I'm also a Special Assistant Attorney General on behalf of the Appellee, the State of Illinois. Your Honors, this Court should affirm the First District's judgment which upheld defendants' felony convictions and sentence. During the two-week trial, the jury was presented an overwhelming amount of evidence. It established that the defendant orchestrated a fake hate crime and falsely reported it to the Chicago Police Department as a real hate crime. The defendant took the stand in his own defense. The jury carefully deliberated over the course of two days and convicted Mr. Smollett. Mr. Weber, let's go a little farther back than that hearing. At the time of the Nowey Pross, the defendant had performed community service. He agreed to forfeit his bond. And the prosecutor on the record stated that this was a just disposition and appropriate resolution to Nowey Pross the case. Do those words indicate some finality to the proceedings? Justice Rochert, the answer is no, they don't. They don't provide finality. And here's why. We can look at this in two ways. One, we should evaluate the facts, and then we should apply those facts under this court's long-standing precedent, whether looking at the Starts case, the Boyd case, or any of the Nowey Pross cases. So, factually, as Justice O'Dell had raised, what was the actual date? So let's go back to that hearing, the March 26, 2019 hearing. And that's where the appellate court, the First District, also started. And that's where this court should start as well. They looked at the transcript from that hearing, and the state's motion in regards to the indictment is to Nowey Pross. As the appellate court correctly found, there's no ambiguity in that statement. And as Your Honor has raised, there are two aspects that Reza Lanier, the Chief Deputy Prosecutor, put on the record. One was, quote, defendant's volunteer service in the community. And as Justice Overstreet had raised, I think, in the question, that's backwards looking. That's not a punishment, and you're going to serve court-ordered community service. The prosecutor acknowledged defendant's volunteer service in the community, which obviously occurred before that hearing. And secondly, the agreement to forfeit the $10,000 bond. Now, you heard Mr. Ucce talk about a lot of things that were not said at that hearing. Let's look at what actually occurred, however. So, Reza, who was in the room? So he did have three defense lawyers in the room. And we know that the defendant would object to the entry of the Nowey Pross. In fact, we know at the actual hearing, after Judge Watkins hears the prosecutor's position as it relates to the Nowey Pross, then turns to lead defense counsel and says, what say you? This is all in the transcript. It's an opportunity to spread of record anything, anything that the defendant wanted to spread of record in conjunction with the state's oral motion to, quote, Nowey Pross the case. And what occurs? Two sentences later in this transcript, chief or lead defense lawyer stands up. Patricia Brown Holmes, one of the most amazing lawyers we've ever seen, seasoned lawyer, stands up and says, quote, Judge, we absolutely agree. We absolutely agree with the Nowey Pross. I think it is important to understand that when she made those statements on behalf of the defendant, she brings with her a wealth of understanding. She's a former Cook County prosecutor, a former federal prosecutor, a former Cook County judge, managing partner of her defense firm. The defense knew exactly what it was getting that day. But more importantly — Let me ask you this. In the context of a Nowey Pross, is there a distinction between a unilateral agreement and a bilateral agreement? No. So a Nowey Pross is always — you can always rebring the charge when there's been a dismissal pursuant to a Nowey Pross, even if there has been a bilateral agreement between the state and the defendant? Correct. Because the question is not the concept of an agreement. The question is an agreement for what. And, Mr. Rochford, you had raised, does that lead to finality? We know in this case it doesn't lead to finality. And, by the way, defense also knows this. They've admitted it on page one of their reply brief. They finally have conceded that — and what else do they absolutely agree with? They absolutely agree with the entry of a Nowey Pross. But what else would they absolutely agree with now? They absolutely agree that under black-letter Illinois law, a Nowey Pross is not a final disposition and will not bar another prosecution. That's this court's case, whether it's Milka or Daniels. And we also know that they also now have eventually agreed that only a clear express dismissal of charges with prejudice bars subsequent charges in the Nowey Pross situation. And we cite two cases for this uneventful proposition. Counsel, I'm going to interrupt you. You acknowledge that you have very capable counsel, the defendant. And so it's your position that the defendant on that date forfeited $10,000 to the city of Chicago with the understanding that when he left the courtroom, the prosecutors could rebring those charges against him. Absolutely. And it's not just my understanding. It's the defense's understanding. They've put it in their papers before the trial court, before Judge Lin. Well, things that are in the papers, I don't know. Is that something we should be considering? Sorry, not in the media statements. They put it in there. It's in the record. They filed it in motion. So maybe we'll talk about the favors of the press later. But they have admitted that this was all done voluntarily. I'll direct the court to the February 2020 motion to dismiss the indictment in where they have acknowledged that everything there was done voluntarily. Let me stop you there. Was the language voluntarily forfeited as a condition of the dismissal of the charge?  So does that suggest that these two things are conditional upon each other? No, because a now process is a dismissal. We're not running from the fact, the state is not running from the fact that a now process is a dismissal. The question is, is it a dismissal with prejudice that precludes potential future indictment? And the answer is unequivocally no, under this court's longstanding precedent. And what's important, we can also just look at two other cases that we have cited that they just didn't respond to. That's the Gill case and the Ryan case. And the Gill case is very instructive. And it reads, quote, before a court may determine that the state is dismissing a charge with prejudice, what must happen? The prosecutor must clearly and explicitly state that she's sort of doing so on the record. And the Ryan case, where this had come up and there was no express dismissal with prejudice, that had been overturned because, as the appellate court held, that there was nothing in the record to show that the dismissal was actually with prejudice. And that's what we have here. We have the exact same situation. And what Mr. Uche and through the papers have raised is that, well, my case is a lot like Stark's. And my client is a lot like defendant in Stark's. And the state's response to that is not so. And at least two very- Counsel, if this court were to determine that there was a non-prosecution agreement, irrespective of the language used in court that day, where would that leave us? It would leave you in affirming the First District's upholding of the convictions and sentence. And that's because-oh, I'm sorry. Even if we determine that there was an agreement to not prosecute, a non-prosecution agreement? Yes. Well, the-so, one, there's not a non-prosecution agreement. Right, but that's not what my question asked. So if there was a non-prosecution agreement, the answer is still no, because it's nowhere in the record as to what the terms of those agreements that would have led to the ability to dismiss those with prejudice. And here's how we can look at it. So your position is that even if the state agreed to not prosecute Mr. Smollett, that you would still have the authority to come back after the fact, after that agreement was expressed in open court, and prosecute? Yes, because the entry of a nollie prosecution is the end of that particular indictment, where they've said we're no longer prosecuting. So it was a not-prosecute-you-today agreement. Correct. It's correct. Exactly what a nollie prosecution is, by the way. But to look at it, yes. So that leads me to a couple of policy questions. So if we accept your argument today, you know, there are 102 counties, each with an elected state's attorney who has the discretion whether or not to proceed with charges. They can request a nollie prosecution. They can make these kind of agreements. And if the same situation were to arise somewhere else, you're saying that that discretion is going to be upended by the potential for a special prosecutor coming in, a special prosecution being commenced, which would, in circumstances like this, impede states' attorneys from exercising their discretion? No. So I think the answer is no, if I'm understanding your question correctly. None of the 101 counties have been impeded at all. I mean, it's been almost six years since the underlying incident occurred. And to my knowledge, there's not a single prosecutor. My question is, could that happen? If we're setting a precedent by ruling in this case, what would stop that from happening? So a situation like this, the state's attorney decides it doesn't want to proceed, it makes the motion to nollie cross, says we've entered into an agreement, and then the judge accepts it, and then whether it's a member of the public, by way of the public outcry that we saw here or a victim's family or something, then find a way to say, you know, we're going to try and proceed with a special prosecution. We're going to resurrect these charges. There's nothing special about this case. I would posit the following. Nothing has the hypothetical that you just reduced has been in existence since at least 1985 because of sparks and voicings. Nothing has changed. This is not setting some sort of new precedent. The concept of a nollie cross and what it means as it relates to finality, what's on the record and what's not on the record, if this court were to rule an appellate's favor, that's where things would change, where this would be a total sea change as it relates to Illinois law. And the reason I raise that is just look at Starks, for example. Starks tells us, and we'll look at, like, Boyd, because we have to look at what was the defendant purportedly surrendering and what gave this court in 1985, what gave this court concern as to what was being surrendered. In Starks, what was being surrendered was the Fifth Amendment privilege against self-incrimination. What are the other cases, though, in Starks' progeny and Boyd, also from 1985, it was where it was surrendered significant constitutional rights or my colleague has raised the Sapinski case where it had surrendered, it had severe constitutional consequences. None of that has occurred in this particular case. This case is actually like Boyd. He argues it's like Starks, but it's actually like Boyd. And I think it's important to understand that while we've heard a lot about the 1985 Starks case, which is a May of 1985, so fast forward a few months, and then same court, same 1985 session as the Boyd case, and there the defendant was arguing for an expansion of Starks, and there this court declined to enforce an alleged plea agreement. Sounds relatively familiar. And then that court then said it was determined that it wasn't necessary to even determine whether an actual plea agreement had existed and no evidentiary hearing was needed. Here's the money line, though, but why? Even if it is assumed that the state had repudiated an agreement, as of no consequential significance, why? Why? Because the state's refusal to abide by the agreement did not deprive the defendant of liberty, one, or any other constitutionally protected interest. So then apply that to this particular case. And as this court did exactly, as Mr. Uche is urging this court to expand Starks, this court then said, let's look at five things that occurred in the Boyd case. The defendant, and we can apply it to this case, did the defendant plead guilty in reliance on the purported agreement? In Mr. Scolese's case, no. In Boyd, this court asked, did it provide the state with any new information in conjunction with the purported agreement? The answer in this case, no. Did he confess guilt in any way? The answer in this case, no. Was he otherwise incriminated in reliance on the purported agreement? No. This court concluded without any of that, in essence, the defendant had surrendered nothing. But what he did do was exchange something of value, his time in community service and $10,000 bond. And you do agree that the state has reached an agreement that it must honor the terms of its agreement. So of those in conjunction for what, I mean, if we were to listen, we actually, so I'm agreeing with you that I believe that the 15 hours of community service and the $10,000 being tended to the city of Chicago are the two things that he brought to the table in conjunction with that hearing. If you listen to sort of their papers and what they've said publicly, that's no deal at all. So we've made that argument. It's there. We're not relying on those statements that his lawyer made two minutes after leaving the hearing and said it was a no-cross and no deferred prosecution and there was no deal at all. We don't rely on those. I think they're informative, and clearly we give this court good law. You think they should be informative to this court in making these decisions? Yeah, I mean, so it's not just about, it's, here's the position. I think it's hard to put that back into the bottle. Our argument is not relying upon this court taking judicial notice of it. We provide law that it hits all three tenets as it relates to why the court certainly can. I would urge the court that it should, but I'll be, it's not, no, it's not relying on it because we could just look at the record that's already before the court, and it doesn't get the relief. Can I ask this, Mr. Weber? If the words nalipras are used, regardless of the other circumstances, what a defendant has relied on or exchanged, even something of value, if those words are used, then a defendant should be cautioned that a reinstatement is always a possibility.  Bringing of those charges again is always a possibility. Sure. I caution in a couple of ways. One, because imagine he could be cautioned by his lawyers, but he's also cautioned by this court's precedent, which is going in and getting a nalipras, receiving a nalipras, is absolutely not finality. And that has been the law in this state for decades. Counsel, if the defendant and his attorney believe that they have an agreement with the state, they can't rely on that agreement that this is the end of the case, notwithstanding the fact that the words nalipras are used. No. Can they rely on that agreement? Yes. All right. And the prosecutor has, is empowered with the discretion to make those decisions, correct? Sure. And made those decisions in this case. Sure. And you're asking us to ignore what was done because? No, no. Because, yes, he got, he received the nalipras, which ended the 2019 case, full stop. He got the benefit of the bargain. Totally consistent with this court's precedent. Absolutely. So it's not as if he didn't receive, he didn't receive the relief that was actually on the record, that was bargained for, that he argued for. But I don't think he believed that he was going to be re-indicted. I don't think that he thought that was part of this agreement. Sure. Let's, this court dealt with that very same issue in Boynton. Dealt with the very same issue. And it said, quote, although the defendant is likely disappointed, not prejudiced. I have no idea. I'm not sure anybody has any idea what Mr. Smollett did or did not intend. It's not, he had baker's dozens of lawyers through this process. He was well counseled. He got the relief that is on the record that his lawyers stood up and said, quote, I absolutely agree with. And if they now want to spread a record of something else, they had plenty of opportunities. In fact, they raised the fact that, listen, that we have things to say. We have things to say, but the state precluded us from doing it. Well, first of all, let me know that's just not so. Judge Watkins said, say whatever you want about the now process. And the words that came out were, we absolutely agree with it. But more importantly, they talk about what happened before Judge Linn did the trial court. We were precluded from raising these arguments and raising evidentiary hearings and making this. And these were in the papers. And I was, I've been involved with the case. I was the prosecutor underneath. And I was thinking, oh, my goodness, can that be true? And the answer is, it's absolutely not true. They presented a 15-page motion on this issue in October of 2021, less than two months before trial. And they didn't ask for this evidentiary hearing where they wanted, like Starks, where after Starks is convicted, he's raising his hands and saying, this can't be. I've got a deal. I want to tell you about the terms. Here they raised this concept, and they never once asked for an evidentiary hearing. Judge Linn said, I'm going to take argument on this. Mr. Gucce presented argument. It's on the record, page R900 through 914. It spends almost 15 pages spreading of record. Never raises this concept of that you need no objections to any of this. Mr. Weaver? Yes. Please bring your remarks to a conclusion. Oh, I will. As it relates to the rest of the issues, we'll rely on the brief. I'll just say this in concluding remarks. It's been 2058 days since the underlying incident. I would respectfully suggest that this case must end. I firmly believe that the facts support affirmance. I believe the law supports affirmance. I believe justice and fairness support affirmance. And by the way, I think that's totally fine. He doesn't have anyone to blame but himself. He masterminded this. He preyed upon society's empathy. He seized upon some very decisive issues of our time of race and sexuality. He blamed it all on his perceived opponents. He got caught. He was convicted. I would ask that this court affirm and can comfortably do so, but not only under the facts, can comfortably do so over at least 40 years of precedent as it relates to Starks and Boyd. And that's why we would ask for this court to affirm. Thank you very much, Mr. Weed. Thank you. Mr. Uche, do you have any rebuttal? Justices, I think it's not to be corrected. The OSP has argued here today that they heavily relied on Boyd. And one of the propositions they made is Boyd came a few months after the Starks case in 85. But the argument is essentially flawed when you consider that Starks 86, a case that enforced the second district's enforced the ruling of Starks 85 came in 1986, a year later. So Starks 86 was well aware of Boyd. But they drew that distinction that I mentioned in my opening, which is in Boyd, he had done nothing. There was a promise made, but there was no specific performance. Boyd was asking the Supreme Court to order specific performance in regards to the plea agreement. And in this particular case, there's already been specific performance, which is why I started out by saying prosecutorial agreements that induce specific performance should be enforced. And that's what our courts have done. And that's what they did in Starks 86, the second district in reliance on the ruling in Starks 85. There's another thing of concern. The OSP mentioned this in their brief, and they brought it up again in oral arguments. The OSP seems to believe that there is no constitutional implication if a person gives up their $10,000 property bond. And that is just, I find it incredible, given the body of law. The 14th Amendment is the first reference. No person can be deprived of life, liberty, or property. It says it right there. In fact, it's mentioned right there, property. And the state seems to be arguing that if it has to do with rights like the Fifth Amendment, First Amendment, or any other amendment, that implicates constitutional scrutiny. But if it has to do with property rights, which is one of the foundations of the founding of this country, well, you can ignore it. And I obviously, the defense disagrees here. I think this case is even more heightened by the fact that the government has essentially walked into court and converted a citizen's property and has walked away with it. And I will mention, they've not returned his money. At no point in time has it been returned. They want to keep his money. They want to keep $10,000 bail bond of a citizen's money and re-prosecute him. So just imagine the dangers for our criminal justice system where prosecutors will be essentially conducting illegal takings for the government. The executive branch, we take your money, we prosecute you, and then we prosecute you again. Maybe we'll have six prosecutions and make $100,000 doing it. So justices, I think, you know, they're asking this court to go down the road that no other courts, they've not cited in their briefs to any court in the United States or in Illinois that has ruled the opposite way when it comes to specific agreements that have already been specifically performed. Counsel, what about this concept that it's at his own risk? The terms used were nallypras. He voluntarily forfeited the money, and when he walked out, he should have been well aware that those charges could be re-brought against him. I think most of the cases I cite and the case law is clear. The government has an advantage. They're the government. They have the power. They draft the instruments. Mr. Smollett is not an attorney. So he shouldn't be punished for any misapprehension or drafting secretarial errors that were done on this particular agreement. The prosecutor should not hide behind technicalities. That was the ruling the First District made in Marion, the Marion case, and in a whole host of cases. The Fourth Circuit Court in Carter, which I cite, U.S. v. Carter, said the same thing. We're not going to give you sustenance behind technicalities as the government. You draft the agreement. So, Justice, I don't think it matters. I think the real question is at the heart of contractual disputes that have gone back since ancient times, which is what was the intent of the parties. And both parties, Cook County prosecutor and Mr. Smollett, agree that the point was to make sure this was a justice position and resolution of the case. And that was done. And the OSP, who were not part of that agreement, did all the terms that Mr. Weber stated on here. He's not sure what the terms were. That's having evidentiary here. I disagree. I think it should be reversed. I humbly ask for that. But even if this court was to say we're not sure, we want to know what happens, we're okay with having an evidentiary hearing. And I think the OSP, out of anyone in this room, should be eager to have an evidentiary hearing and to discover what the prosecutor is meant to say. But I think they already know the answer to that through the investigation. I have nothing else. Thank you very much. Thank you, Justice. Thank you. Mr. Oche, Mr. Weber, the court thanks you for your briefs and your arguments. This case will be taken under advisement.